**In re BEITZELL & CO., INC., Debtor.**

**BEITZELL & CO., INC., Plaintiff,**

v.

**The FEDERAL DEPOSIT INSURANCE CORPORATION, As Receiver for the National Bank of Washington, Defendant.**

Bankruptcy No. 90–00211.
Adv. No. 90–0091.

United States Bankruptcy Court,
District of Columbia.

Nov. 9, 1993.

Alan S. Dubin, Bethesda, MD, for debtor/plaintiff.

Glenn M. Young, Washington, DC, for defendant.

*DECISION GRANTING IN PART, DENYING IN PART THE FDIC'S MOTION TO DISMISS*

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The court considers a motion to dismiss for failure to state a claim upon which relief can be granted, filed by the Federal Deposit Insurance Corporation ("FDIC"), as Receiver for the National Bank of Washington ("NBW"), and the opposition thereto filed by the debtor, Beitzell & Co., Inc. ("Beitzell").

The FDIC's motion to dismiss should be denied unless it appears beyond doubt that Beitzell can prove no set of facts in support of its claims that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Tele-Communications v. United States,* 757 F.2d 1330 (D.C.Cir.1985); *McGowan v. Warnecke,* 739 F.Supp. 662 (D.D.C.1990); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1094 (N.D.Tex.1990). For purposes of this motion, the court accepts as true the allegations of Beitzell's complaint and construes the allegations in light most favorable to the non-movant. *Bell & Murphy and Assoc. v. Inter-First Bank Gateway, N.A.,* 894 F.2d 750, 752 n. 1 (5th Cir.1990); *High v. McLean Fin'l Corp.,* 659 F.Supp. 1561, 1565 (D.D.C.1987).

*I. Procedural and Factual Background*

On March 20, 1990, Beitzell filed a petition for relief under Chapter 11 of the Bankruptcy Code. On August 2, 1990, Beitzell commenced this adversary proceeding against NBW, asserting claims for breach of good faith and fair dealing, breach of fiduciary duty, tortious interference with existing contract, tortious interference with prospective business, and negligent misrepresentation. Beitzell seeks compensatory damages in the amount of $5,000,000 and punitive damages in the amount of $25,000,000.

On August 6, 1990, NBW filed a proof of claim against Beitzell in the amount of $2,545,000. Thereafter, on August 9, 1990, Beitzell filed an Amended Complaint and Objection to Claim. In addition to asserting the five counts contained in the original complaint, Beitzell objects to the claim filed by NBW and seeks an order providing that NBW's claim is only $765,845.00. Under the doctrine of recoupment, Beitzell contends that its claim against NBW constitutes a complete defense to any payment on NBW's claim, and that NBW is not entitled to any payments by Beitzell.

On August 10, 1990, the Office of the Comptroller of the Currency declared NBW insolvent and appointed the FDIC as its Receiver. On April 8, 1991, the FDIC filed a motion to dismiss Beitzell's Amended Complaint and Objection to Claim on the grounds that 12 U.S.C. § 1823(e), the *D'Oench Duhme* doctrine, and the federal holder in due course doctrine preclude Beitzell from asserting its claims against the FDIC. This motion was taken under advisement after oral argument and full briefing by the parties.[1]

Beitzell is a corporation duly organized and existing under the laws of the District of Columbia and has its principal place of business in Washington, D.C. Beitzell is and has been in the business of distributing liquor and other spirits at wholesale for over 50 years.

Beitzell alleges that it entered into a banking relationship with NBW in the 1940s and deposited substantial sums of money and kept substantial balances in its accounts with NBW until the mid-1980s. On January 16, 1986, Beitzell and NBW executed a Revolving Note in the amount of up to $3,000,000 payable upon demand and a Term Note totalling $550,000 ("Notes"). Both Notes were secured pursuant to a Loan Security Agreement ("Agreement") which essentially required Beitzell to deposit its collection of accounts receivable and inventory proceeds into an account with NBW. Under the Agreement, Beitzell alleges that it was entitled to borrow and NBW was obligated to lend the value of 80% of the eligible accounts receivable plus 50% of eligible inventory (the "Borrowing Formula") up to a maximum of

---

1. On September 20, 1991, the court denied the FDIC's second motion to dismiss for lack of subject matter jurisdiction. On December 20, 1991, the district court denied the FDIC's request for leave to pursue an interlocutory appeal of that order.

$3,000,000. Beitzell never exceeded the Borrowing Formula.

Beitzell further alleges that at all relevant times, Beitzell was current with its interest payments to NBW and was never otherwise in default under the terms of the Revolving Note, the Term Note and the Agreement.

In 1988, Beitzell and NBW conducted discussions regarding Beitzell's acquisition of an Arlington, Virginia liquor wholesale entity, doing business as Virginia Imports, Ltd. ("Virginia Imports"). NBW consented to Beitzell's purchase and agreed to finance the acquisition. Pursuant to the Beitzell–NBW financing agreement, NBW disbursed in excess of $1,000,000 to Beitzell against its revolving line of credit. Furthermore, Beitzell received consent to disburse $1,600,000 to Virginia Imports, but only after Beitzell had obtained a security interest in Virginia Import's inventory, and assigned such interest to NBW as further collateral. In the beginning of 1989, NBW demanded that Beitzell and Virginia Imports be financed as separate borrowers, and thus refused to include the value of Virginia Import's inventory in the borrowing base used to determine Beitzell's ability to borrow against inventory.

In the Amended Complaint, Beitzell describes an unconsummated transaction between Forman Brothers, Inc. ("Forman Brothers") and Beitzell concerning the sale of certain of its liquor lines, including its four most successful lines. This sale was an effort to reverse business losses that occurred in the late 1980s. Beitzell alleges that NBW's actions deprived Beitzell of the benefits of this attempted sale. In January of 1990, Beitzel and Forman Brothers conditionally executed a purchase agreement. Under the relevant purchase terms, Forman Brothers would purchase certain of Beitzell's inventory at cost, and would acquire certain liquor lines for a premium of $800,000. As a condition of closing, Beitzell had to obtain NBW's consent to consummate the Forman Brothers deal. Beitzell alleges that prior to signing the purchase agreement, an NBW

vice-president, Joseph McGrath, orally informed Beitzell that NBW would consent to the transaction. However, on January 31, 1990, NBW mailed a letter to Beitzell informing it that NBW would not give its consent to the proposed sale unless Beitzell agreed to pay NBW's legal fees. Beitzell alleges that due to the time pressure, it was forced to agree to this request.

Beitzell further alleges that despite a meeting held on February 5, 1990, where two NBW vice-presidents stated the transaction would be in Beitzell's best interest, NBW refused to give its consent, except under terms which Beitzell alleges were unreasonable and coercive. NBW demanded that all proceeds of the sale be paid over to NBW, including the $800,000 premium. Beitzell contends that this demand was improper since NBW had only advanced 50% of the value of the inventory to Beitzell. NBW also indicated that Beitzell would have no further right to borrow after the sale to Forman Brothers. Beitzell contends that these terms were unreasonable, demanded in bad faith, and were not reasonably necessary to protect NBW's position.

In response, the FDIC contends that NBW was merely exercising its discretion regarding the sale of the collateral proposed by Beitzell and that its insecurity regarding Beitzell's ability to honor its debts to the banks was the reason for such refusal. The FDIC also contends that NBW's concerns were heightened upon learning that Beitzell was a judgment debtor of the Teamster's Union.[2]

On February 22, 1990, Beitzell met with NBW to discuss obtaining NBW's consent. Beitzell alleges that an NBW vice president stated that NBW would not take a position that would be perceived by the Teamsters Union as helpful to Beitzell due to NBW's close ties with labor unions. Beitzell further alleges that NBW stated that because the deal would not close, it had decided to accelerate Beitzell's debt to NBW and to foreclose on Beitzell's inventory.

2. A few days before the deal was to close, the National Labor Relations Board, acting on behalf of the Teamsters' Union, moved to enjoin the transaction absent some set-aside to secure a contingent back-pay liability that had been incurred in connection with a 1987 Board proceeding. The court of appeals granted the relief sought.

Beginning on February 22, 1990, NBW refused to honor checks drawn on Beitzell's account. Beitzell contends that funds should have been available under its revolving line of credit and that the dishonored checks had been issued before NBW decided to accelerate the debt. Certain of these checks were for payments of federal payroll tax obligations and obligations owed the D.C. government.

On February 23, 1990, NBW sent a demand letter to Beitzell declaring that Beitzell was in default under the loan documents and called for payment of both notes in three days. Beitzell alleges that they were not in default, and thus NBW wrongfully declared such a default. Beitzell contends that at the time NBW called the notes due, NBW was fully and adequately secured and the prospects of Beitzell's making repayment were certain. Beitzell had assets of approximately $7,750,000 and liabilities of approximately $6,640,000 and NBW was its only secured creditor.

On February 26, 1990, NBW sent a letter informing Beitzell of its failure to pay on demand and stated NBW's intention to enter upon Beitzell's premises and seize its inventory. Beitzell permitted NBW to enter the premises shortly thereafter in an effort to minimize damages to its business.

In early March 1990, Beitzell contends that NBW demanded it to employ an auctioneer at an exorbitant price to sell Beitzell's inventory within the next thirty to sixty days. When Beitzell refused, NBW threatened to notice the foreclosure sale of real estate securing the notes and to accelerate the Virginia Imports note. Beitzell contends that by its actions, NBW ultimately forced Beitzell out of business and into bankruptcy, thus providing the grounds for the five counts in its Amended Complaint.

## II. Does Federal Holder in Due Course Status Bar Beitzell's Claims?

■ The FDIC has argued that it is entitled to holder in due course status with respect to its loan instruments and, as such, Beitzell is barred from asserting all five counts in its Amended Complaint against the FDIC.[3] The arguments of both parties focus on whether this doctrine applies to nonnegotiable instruments, and accordingly, whether the Notes at issue are negotiable. However, the court does not need to reach these issues in light of its prior ruling in *In re 1301 Connecticut Ave. Assoc.*, 126 B.R. 823, 830–831 (Bankr.D.D.C.1991).

■ In *1301 Connecticut Ave.*, this court held that the federal holder in due course doctrine is limited to purchase and assumption transactions. 126 B.R. at 830 (citing *Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244 (5th Cir.1990)); *Sunbelt Savings, FSB Dallas, Texas v. Montross*, 923 F.2d 353 (5th Cir.1991); *FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1518 (11th Cir.1984).[4] Other courts appear to agree with this conclusion. *See In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332 (1st Cir.1992) (federal holder in due course doctrine was fashioned precisely for the purpose of expediting purchase and assumption transactions and thus only applies in those cases); *FDIC v. Laguarta*, 939 F.2d 1231, 1239 n. 19 (5th Cir.1991) (doctrine inapplicable absent purchase and assumption transaction); *Desmond v. FDIC*, 798 F.Supp. 829, 841 (D.Mass.1992).

■ There being no suggestion that the FDIC in this case is acting other than as a liquidator of NBW's assets, the FDIC is not entitled to invoke the federal holder in due course doctrine as a bar to any of Beitzell's claims.[5] Therefore, the court must consider

3. Neither party addresses whether the "defenses" are personal or real. However, they are personal defenses. *See* D.C.Code Ann. § 28–3:305.

4. Moreover, as *Campbell Leasing* makes clear, even if the federal holder in due course doctrine applies, the FDIC as receiver must still defend against any assertion of these claims against the receivership estate. 901 F.2d at 1249 (plaintiff entitled to try their claims, liquidate amount of

damages and receive a pro-rata share of insolvent bank's assets). Thus, even if the doctrine was found to apply, it would only act to prevent Beitzell from asserting any "personal" claims as a defense or setoff to its debt to NBW. *See 1301 Conn. Ave.*, 126 B.R. at 826.

5. Even if the doctrine was not limited to purchase and assumption transactions, it is doubtful that the doctrine would apply in this case. As noted in *1301 Connecticut Ave.*, the circuits are in

whether the *D'Oench Duhme* doctrine ("*D'Oench*") or 12 U.S.C. § 1823(e) bars such claims.

## III. *D'Oench Duhme and 12 U.S.C. § 1823(e)*

### A. Brief Overview of *D'Oench* and the Statute

■ The *D'Oench Duhme* doctrine is a common law rule of estoppel which precludes a borrower from asserting against the FDIC defenses based upon secret or unrecorded "side agreements" that alter the terms of facially unqualified obligations. *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 460, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942).[6] This doctrine shields the FDIC from claims[7] and defenses based upon agreements not firmly established in the failed financial institution's official records. *Resolution Trust Corp. v. Oaks Apts. Joint Venture*, 966 F.2d 995, 998 (5th Cir.1992); *Bowen v. FDIC*, 915 F.2d 1013, 1015–16 (5th Cir.1990). In addition, the doctrine prevents the FDIC from being held liable for a claim that is inconsistent with the written documents of the failed institution or based on an unrecorded oral or written side agreement. *D'Oench*, 315 U.S. at 459, 62 S.Ct. at 680. As one court has noted, the development of *D'Oench* over the years has been "expansive and perhaps startling in severity." *Bowen*, 915 F.2d at 1015.

■ Although the Supreme Court did not set out a specific test to determine when the doctrine applies, the Court indicated that the doctrine's applicability depends upon whether the alleged agreement was "designed to deceive the creditors or the public authority or would have that effect." *D'Oench*, 315 U.S. at 460, 62 S.Ct. at 681. Moreover, the borrower's intent is irrelevant; the proper inquiry is "whether the borrower lent himself to a scheme or arrangement that would be likely to mislead or deceive banking authorities." *Id.* And a party can be said to have lent themself to a scheme or arrangement simply by failing to reduce the agreement relied upon to writing. *Timberland Design, Inc. v. First Service Bank*, 932 F.2d 46, 48–49 (1st Cir.1991).

■ In addition to the *D'Oench* doctrine is its statutory counterpart, 12 U.S.C. § 1823(e). Section 1823(e) protects the FDIC against any agreement which tends to diminish or defeat the FDIC's interest in any asset acquired by it unless such agreement: (1) is in writing; (2) was executed by the depository institution and the obligor contemporaneously with the acquisition of the asset; (3) was approved by the board of directors of the depository institution or its loan committee; and (4) has been continuously an official record of the depository institution.[8] Courts strictly adhere to these re-

---

conflict as to whether the doctrine applies to nonnegotiable notes. The Fifth Circuit has consistently held that the doctrine does not apply to such instruments. *Sunbelt Savings*, 923 F.2d at 357, *remanded on other grounds*, 944 F.2d 227 (5th Cir.1991); *FDIC v. Payne*, 973 F.2d 403 (5th Cir.1992); *RTC v. Oaks Apt. Joint Venture*, 966 F.2d 995 (5th Cir.1992). If this holding is followed, it would provide an independent basis for precluding the application of this doctrine since the Notes in this case were not negotiable. As this court held in *1301 Connecticut Ave.*, a note with a variable interest rate tied to the prime rate is not a negotiable instrument because it does not contain "an unconditional promise to pay a sum certain" required by D.C.Code § 28:3–104. Both Notes in this case were alleged to provide for a variable rate of interest tied to the prime rate and thereby would not be negotiable instruments.

6. In *D'Oench*, the FDIC sought to enforce a note that it acquired when a bank failed. The maker of the note raised as a defense an oral agreement

with the bank that the note would not actually be called for payment.

7. Beitzell is essentially asserting claims against the FDIC, rather than asserting defenses. However, the courts have consistently held that if the defenses are barred by the *D'Oench Duhme* doctrine, then the defenses framed as a cause of action must also be barred, as any other result would nullify the doctrine. *Kilpatrick v. Riddle*, 907 F.2d 1523, 1528 (5th Cir.1990); *Bell & Murphy & Assoc.*, 894 F.2d at 753 (*D'Oench* bars affirmative claims based upon unrecorded agreements); *604 Columbus Avenue Realty Trust*, 968 F.2d at 1344 (*D'Oench* applies to bar affirmative claims as well as defenses premised on secret agreements).

8. Section 1823(e) provides in pertinent part: "No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title . . . shall be valid against the Corporation unless such agreement—

quirements. *American Federation of State, County and Municipal Employees v. FDIC,* 826 F.Supp. 1448, 1456 (D.D.C.1992).

By its terms, section 1823(e) only protects the FDIC from "agreement[s]" not satisfying the statute's requirements. However, the Supreme Court, in the only decision considering this area of the law since *D'Oench* and the enactment of § 1823(e), interpreted the term "agreement" broadly to include *all* conditions to the parties' performance of their bargain. *Langley v. FDIC,* 484 U.S. 86, 90–93, 108 S.Ct. 396, 400–02, 98 L.Ed.2d 340 (1987). In *Langley,* the parties asserted the defense that they were fraudulently induced to enter into the note by the bank's misrepresentations concerning the land at issue. The Court found that the truthfulness of alleged representations by the bank was a condition to performance of the maker's obligation to repay the loan, and thus such representations would constitute a main component of an "agreement" for purposes of § 1823(e). *Id.* at 91, 108 S.Ct. at 401. In essence, the parties were attempting to enforce an oral warranty through an action for fraud. Because the representations did not meet the requirements of the statute, the Court held that such claims were barred by § 1823(e). *Id.* at 96, 108 S.Ct. at 403.

■ Given this broad interpretation of the term "agreement," an obligation of good faith and fair dealing and the obligation to act as a fiduciary would be viewed as *conditions* to the performance of the borrower's obligation. *See New Maine Nat'l Bank v. Benner,* 774 F.Supp. 36, 40 (D.Maine 1991) (defense of breach of duty of fiduciary duty is nothing more than assertion that the lender's performance of its fiduciary duty was a condition to the repayment of the note); *Clay v. FDIC,* 934 F.2d 69, 72 (5th Cir.1991) (duty to manage loan prudently is a condition that falls within definition of "agreement"). These conditions would constitute part of the overall "agreement" for purposes of § 1823(e)

and would need to satisfy the statute's rigorous requirements in order for Beitzell to base a claim upon such obligations.

■ Because the term "agreement" is defined broadly, the protection afforded by *D'Oench* and the statute often overlap. As one district court judge noted, "Over the years, the case law surrounding *D'Oench* and the statute ... has cross-pollinated such that it is difficult to decide where the statute ends and *D'Oench* begins ... the crucial question is the total protection that the statute and *D'Oench* together provide." *American Federation,* 826 F.Supp. at 1457. Courts have adopted different views with respect to the relationship between the common law *D'Oench* doctrine and 18 U.S.C. § 1823(e). *Compare Bowen,* 915 F.2d at 1015 n. 3 (§ 1823(e) codified *D'Oench*) *with American Federation,* 826 F.Supp. at 1460 (statute is partial codification of *D'Oench*) *and Tuxedo Beach Club Corp. v. City Fed. Sav. Bank,* 749 F.Supp. 635, 641 (D.N.J.1990) (statute is broader in that it applies to any agreement, whether or not it is secret and regardless of the maker's participation in the scheme, but also narrower in that it only applies to agreements, and not to other defenses the borrower might raise). This court finds no reason to disagree with Judge Lamberth's conclusion in *American Federation* that both *D'Oench* and the statute, while overlapping, are capable of somewhat different interpretations. Thus, this decision is based upon the protection provided by both *D'Oench* and the statute. *See Washington Properties v. RTC,* 796 F.Supp. 542, 545 n. 3 (D.D.C.1992) (Judge Richey).

### B. Policy Background

■ Before addressing Beitzell's claims, it is important to understand the policies behind *D'Oench* doctrine and section 1823(e). One purpose of both *D'Oench* and § 1823(e) is to enable examiners accurately to deter-

(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
(4) has been, continuously, from the time of its execution, an official record of the depository institution."

mine the health of an institution based on an examination of the formally maintained written records of the institution. *D'Oench*, 315 U.S. at 460, 62 S.Ct. at 680; *Langley*, 484 U.S. at 91–92, 108 S.Ct. at 401–02. *See Bowen*, 915 F.2d at 1016 ("The doctrine means that the government has no duty to compile oral histories of the bank's customers and loan officers ..."). In light of this policy, a court must consider "whether the transaction at issue—explicitly an 'agreement' under the statute or an 'arrangement' under *D'Oench*—would tend to deceive bank examiners" when determining whether a claim or defense is barred. *American Federation*, 826 F.Supp. at 1461.

■ Another policy of both *D'Oench* and section 1823(e) is to place the risk of nonrecovery on borrowers in situations where they could have protected themselves by including the terms of their agreement in writing. *See Langley*, 484 U.S. at 94, 108 S.Ct. at 402. This policy choice is premised on the rationale that while borrowers are in a position to protect themselves by negotiating for certain terms and conditions, depositors and creditors of the bank cannot protect themselves against harm and thereby should be favored when an institution fails. *Id.; American Federation*, 826 F.Supp. at 1461–62.

■ Finally, one additional purpose behind section § 1823(e), evidenced by the requirements of the statute itself, is to "ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank is headed for failure." *Langley*, 484 U.S. at 92, 108 S.Ct. at 401.[9]

## C. Does *D'Oench* or Section 1823(e) Bar Beitzell's Claims?

■ Although the *D'Oench* doctrine has been interpreted expansively, it has not been read to mean that there can be no defenses at all to attempts by the FDIC to collect on promissory notes. *FDIC v. Laguarta*, 939 F.2d at 1237 (maker can sue bank for breach of funding obligation in note); *FDIC v. McClanahan*, 795 F.2d 512, 515 (5th Cir. 1986) (maker may defend that bank breached its obligation under the note). There is no doubt that a defense or claim that is based solely on alleged representations or agreements that are unrecorded is barred by the *D'Oench* doctrine and its statutory counterpart, § 1823(e).[10] However, when claims are based on provisions in the loan documents themselves, such claims are not barred. *See, e.g., Oaks Apartments Joint Venture*, 966 F.2d at 1000 ("When an agreement between a borrower and a lender imposes mutual obligations to perform agreed-to requirements, and the lender does not fully perform, *D'Oench* will not bar the borrower from asserting claims based upon the failure of the lender to satisfy his respective obligation"); *Howell v. Continental Credit Corp.*, 655 F.2d 743, 746–47 (7th Cir.1981) (*D'Oench* does not bar enforcement of facially manifested bilateral obligation and bank's obligation to obtain title was in lease recorded in bank's records); *Bell & Murphy*, 894 F.2d at 754 (bank's obligation must appear on the face of the document which FDIC seeks to enforce); *Laguarta*, 939 F.2d at 1238–39 (doctrine does not preclude a claim that arises out of an obligation contained in the Loan Agreement itself)[11]; *RTC v. Wellington Dev. Group*, 761 F.Supp. 731, 737 (D.Colo.1991) (*D'Oench* and § 1823(e) do not bar defenses arising out of

---

9. The Court held that none of the statute's purposes would be met "if an element so fundamental as a condition upon the obligation to repay is excluded from the meaning of 'agreement.'" 484 U.S. at 92.

10. For example, Beitzell cannot assert against the FDIC–Receiver any claims arising from NBW's alleged breach of an unwritten agreement to consent to the sale of Beitzell's collateral to Forman Brothers.

11. In *Laguarta*, the maker asserted, as a defense to collection on the note by the FDIC, that the

lender breached its funding obligation under the Loan Agreement. The court concluded that because the funding obligations were "spelled out" in the Loan Agreement, *D'Oench* did not apply. 939 F.2d at 1239. The court did note, however, that *D'Oench* precluded the use of plaintiff's assertions that the president of the bank had represented that the bank would continue to extend and modify its loan as necessary against the FDIC. 939 F.2d at 1235 n. 10. However, since the claim was not premised solely upon these unrecorded representations, it was not barred by *D'Oench*.

express terms of loan documents). *See also RTC v. Montross*, 944 F.2d 227, 228–29 (5th Cir.1991) (personal defenses to which the maker is entitled must of course be based on documents of the bank at the time of insolvency and not upon secret agreements unenforceable under *D'Oench* ); *FDIC v. Texas Country Living*, 756 F.Supp. 984, 987 (E.D.Tex.1990) (*D'Oench* has been expanded to defeat nearly every defense that is not based on a written document in the file with the lending institution).

 Likewise, section 1823(e) cannot be said to bar all claims and defenses. Congress has created an elaborate administrative system to deal with claims asserted by individuals against failed institutions. *See* 12 U.S.C. § 1821. Included in this scheme is a specific provision which states, "... any agreement which does not meet the requirements set forth in section 1823(e) of this title shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation." 12 U.S.C. § 1821(d)(9)(A). Having expressly provided for the exclusion of claims that are based on agreements that fail to meet the requirements of § 1823(e), nevertheless, some claims are beyond the scope of that section and can be asserted against the FDIC.

 A careful examination of the cases finding that a claim or defense is barred by *D'Oench* and/or § 1823(e) reveals that those defenses or claims are premised solely on unrecorded agreements, promises or representations and not on any obligation found explicitly in the loan documents.[12] *See, e.g., Bell & Murphy*, 894 F.2d at 753 (claims of fraudulent misrepresentation and breach of contract arose out of unrecorded agreement to make future loans); *Kilpatrick v. Riddle*, 907 F.2d at 1525 (claim that maker was fraudulently induced into signing note by a scheme to defraud investors in violation of federal securities laws barred by *D'Oench* );

*Beighley v. FDIC*, 868 F.2d 776, 778. (5th Cir.1989) (claims for breach of contract, breach of fiduciary duty, promissory estoppel and fraud all were based on an alleged breach of an oral agreement and thus barred by *D'Oench* ); *604 Columbus Ave. Realty Trust*, 968 F.2d 1332 (plaintiff's tort and contract claims were held to be barred by *D'Oench* when premised solely on a secret kickback arrangement)[13]; *Torke v. FDIC*, 761 F.Supp. 754, 757 (D.Colo.1991) (nothing in the loan documents, security agreements, or modification agreements evidences any agreement upon which claims for breach of fiduciary duty, negligent misrepresentation, and breach of contract can be based).

 Accordingly, the proper inquiry is whether any of Beitzell's claims are premised on an obligation that is found in the loan documents or are not premised on an agreement whatsoever. If the latter, then such claims would not be barred by either *D'Oench* or § 1823(e).

*Count I*

 Count I alleges a breach of duty of good faith and fair dealing. Beitzell points out that D.C.Code Ann. § 28:1–203 imposes an obligation of good faith and fair dealing in every contract that falls within the UCC. Thus, the notes and security agreements at issue, which are subject to the UCC,[14] include this duty (obligation) of good faith and fair dealing. The question, however, is whether an obligation implied by law can be said to be found expressly in the loan documents. Certainly if the court followed a literal interpretation of what it means for an obligation to appear expressly in the document, it could not be said that this duty appeared in the document. However, this court is not of the view that such a literal interpretation is warranted. A provision implied as a matter of law in every loan agree-

---

12. None of the reported cases get beyond the "agreement" stage and address such requirements of § 1823(e) as the approval by the board of directors or loan committee and the existence of a minute.

13. Although the trust tried to argue that its claims were based on a factual basis independent

of the kickback arrangement and on express terms in the loan agreement, the bankruptcy court had explicitly found that these claims were premised on the kickback scheme.

14. *See* D.C.Code Ann. §§ 28:9–102(1)(a), 9–104, 9–105(1) and 28:3–104(2)(d), 3–104(3).

ment should be treated as appearing on the face of the agreement.

The Fifth Circuit has held that claims based on UCC obligations implied in the loan agreement are not barred by *D'Oench*. *Texas Refrigeration Supply, Inc. v. FDIC*, 953 F.2d 975, 980–81 (5th Cir.1992) ("*TRS*"). In *TRS*, the borrower sued the lender for breach of contract, wrongful acceleration, unreasonable disposal of collateral at foreclosure, breach of fiduciary duty, misrepresentation, and breach of good faith. Plaintiffs argued that pursuant to the Texas UCC, creditors are forbidden from accelerating loans except for good cause [15] and must dispose of collateral in a commercially reasonable way. They further contended that because these obligations are inferred as a matter of law in any and every loan agreement, they appear on the face of the notes. The court agreed and held that because the claims for wrongful acceleration and unreasonable foreclosure sale were premised on obligations implied by law, they were not barred by *D'Oench:*

> *D'Oench Duhme* does not of itself thwart the assertion of rights for relief from wrongful acceleration and unreasonable sale at foreclosure. *See Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 595 (5th Cir.1991) ("[Neither section 1823(e) nor the *D'Oench Duhme* doctrine prevents plaintiffs from asserting claims or defenses that do not depend on agreements.") . . .

Obligations about timely acceleration and the disposal of collateral are implicit in every promissory note. These covenants are inferred in every such loan agreement.... And because they are an integral element of the relationship between every borrower and lender, they cannot be

said to be secret or unwritten in the *D'Oench Duhme* sense....

*TRS*, 953 F.2d at 981.

The court also emphasized, however, that any claim premised on an oral agreement cannot be asserted against the FDIC. *TRS*, 953 F.2d at 982 n. 13 and 983. Thus, the court held that plaintiff's claims for breach of contract, breach of fiduciary duty, misrepresentation, and breach of good faith,[16] all of which were premised on one or more oral agreements to extend future credit, were barred by *D'Oench*.[17]

In *TRS*, the court failed to mention its earlier decision in *FDIC v. Hamilton*, 939 F.2d 1225 (5th Cir.1991), which addressed whether obligations implied pursuant to local banking custom can be asserted against the FDIC. In *Hamilton*, the borrowers attempted to set off their note obligation by alleging that the bank breached its obligation to timely advance funds pursuant to a line of credit. Although the local banking custom was for the bank to fund the full amount requested within one business day, this obligation was not recorded anywhere in the bank's records. Accordingly, the court held that "the long arm of *D'Oench Duhme* reaches out to block their claim." 939 F.2d at 1229. In so holding, the court concluded "the rationale that bars claims based on oral and collateral writings is equally applicable to claims based on unwritten, albeit widespread and prevailing, banking customs." *Id.* Like unrecorded agreements, implied obligations would not be readily apparent to FDIC examiners and the FDIC would face a similar burden in attempting to ascertain the bank's concealed liabilities. *Id.*[18] Moreover, the obligor could have insisted that the terms be put in writing by the bank.

---

**15.** Tex.Bus. & Comm.Code § 1.208 (Tex.UCC). D.C.Code Ann. § 28:1–208 imposes the same requirement.

**16.** Significantly, the court did not address whether the duty of good faith was implied as a matter of law apparently because the argument was not raised.

**17.** The court held that although certain claims were not barred, any allegations of oral agree-

ments cannot be used as evidence to support those claims. *TRS*, 953 F.2d at 982 n. 13.

**18.** The court rejected the Hamiltons' argument that the burden in this case would not be severe since the FDIC would only have to investigate the local custom regarding each type of instrument in general, rather than investigate each individual asset.

■ Although *Hamilton* and *TRS* may appear to be contradictory, *Hamilton* is distinguishable from *TRS* (and from the case at bar) on the basis that an obligation implied as a matter of law is different in nature than an obligation implied by local custom. Whereas the FDIC might not be aware of local custom, nor have the duty to be aware of such, it does have a duty to know the law and any obligations imposed by such laws. To find otherwise would essentially be exempting the FDIC from the law. The FDIC should not be allowed to escape the imposition of such an obligation by reliance upon *D'Oench* or § 1823.

■ Even if Beitzell is not barred by *D'Oench* from establishing that NBW owed an obligation of good faith, the court must consider whether section 1823(e) demands a different conclusion. In *TRS*, the court suggested that it would reach the same conclusion under § 1823(e) noting that "we have long held that the statutory and common law *D'Oench Duhme* doctrines bar essentially the same claims and defenses; that is they are virtually interchangeable." 953 F.2d at 979 n. 3. As stated above, this court does not view *D'Oench* and § 1823(e) as entirely inclusive of each other and a closer inquiry of whether the statute's requirements would be met is necessary. The district court for this district has held that a claim for the breach of an implied obligation of good faith asserted against the FDIC as receiver is barred by section 1823(e). *Washington Properties Limited Partnership v. RTC*, 796 F.Supp. at 549.[19] Although the court cited *TRS*, it noted that it was not directly on point and that in any event, it was not binding on the court. 796 F.Supp. at 549.

In *Washington Properties*, the plaintiff contended that its claim for the bank's breach of the covenant of good faith and fair dealing, which is implied in all contracts, was not barred. 796 F.Supp. at 546, 549. It argued that *D'Oench* is an equitable doctrine which should not be used to thwart the equitable doctrine of the implied covenant of good faith. In rejecting this argument, the court noted that the thrust of the plaintiff's claims was fraud in the inducement, and that its decision was based primarily upon § 1823(e) rather than on *D'Oench*. 796 F.Supp. at 546. The court also emphasized that wherever there is an allegation of fraud there must also be an implied allegation of a breach of the implied covenant of good faith and fair dealing. Thus, to accept plaintiff's argument "would be to strip § 1823(e) of its powers, and deprive of its power the Supreme Court's holding that fraud in the inducement claims are governed by § 1823(e)." 796 F.Supp. at 546. The case at bar, however, is distinguishable from *Washington Properties* and is more analogous to *TRS*. First, the implied covenant of good faith and fair dealing that the parties attempted to rely upon in *Washington Properties* was one imposed as an equitable doctrine by the court in *Hais v. Smith*, 547 A.2d 986 (D.C.1988). Beitzell in addition to citing *Hais* relies upon the provision in the D.C. version of the UCC, D.C.Code Ann. § 28:1–203, that implies an obligation of good faith and fair dealing in the performance of the contract.[20] More importantly, the parties in *Washington Properties* were not trying to imply the good faith obligation to any one specific provision or right that was evidenced in the loan documents. Rather, they wanted the court to imply the obligation in a general, equitable sense governing duties or promises that were all unrecorded and nowhere to be found in the loan documents (and, indeed, were negated by the loan documents themselves). Beitzell, on the other hand, is seeking to imply the obligation of good faith with respect to the exercise of certain rights provided expressly in the loan documents. In other

---

19. Plaintiff's claim for fraudulent inducement was premised on allegations that the lender misrepresented its ability to administer the loan, failed to perform its promise to disburse funds, and failed to advise plaintiffs of deviations from the Agreement. The court held that no document meeting the requirements of section 1823(e) was introduced in which the bank made any representations about its ability to adminis-

ter, or in which the bank accepted any duty. 796 F.Supp. at 546. Moreover, the documents explicitly stated that such a duty would not be owed.

20. Section 28:1–203 provides: "Every contract or duty within this subtitle imposes an obligation of good faith in its performance or enforcement."

words, Beitzell is arguing that NBW acted in bad faith with respect to actions taken regarding provisions actually in the loan agreement. Rather than implying the obligation of good faith and fair dealing to duties or obligations that simply cannot be said to exist because proof of such is barred by *D'Oench* and § 1823(e), Beitzell is asserting that the obligation of good faith and fair dealing governs the actions NBW took while exercising its rights and obligations that are specifically set forth in the loan agreement. Thus, allowing this count to go forward would not circumvent the court's holding in *Langley* regarding the scope of § 1823(e).

 Because the obligation of good faith can be said to be part of the loan documents, the requirements of section 1823(e) are satisfied, for the Loan Agreement itself fulfills those requirements. Although the court in *Hamilton* construed the term "writing" narrowly such that only those obligations literally expressed on the face of the contract satisfy this requirement, extending section 1823(e) such that any obligation required by law must be in writing in order to be effective against the FDIC simply is not warranted. *Hamilton*, 939 F.2d at 1231. It suffices that the loan agreement is in writing and that the obligation is included in the agreement as a matter of law. Even though Beitzell could have had NBW's obligation to act in good faith included in the loan agreement, or somehow limited in writing NBW's ability to exercise the provisions in the Agreement, parties entering into a bargain should be able to assume that the parties will act in accordance with obligations imposed by the law without having to explicitly set forth what the law is. Moreover, the purpose behind the *D'Oench* doctrine is to protect against secret or unrecorded obligations or conditions, and an obligation implied by law as to a recorded contract is neither secret nor unrecorded. And while section 1823(e) is strict, extending it to exempt the FDIC from obligations imposed by law is simply not warranted.

 However, even if Beitzell is able to establish that a duty to act in good faith was owed, Beitzell's claim that the duty was breached cannot be premised solely upon alleged oral agreements or representations. *See Lake Forest Developments v. FDIC*, 989 F.2d 197, 201 (5th Cir.1993) (claim for breach of fiduciary duty that relied solely upon alleged oral modification was barred but claim that notice of foreclosure was inadequate did not rely on alleged oral representations and was not barred). In its Amended Complaint, Beitzell has asserted ten grounds in support of its claim that NBW acted in bad faith.

 Beitzell first alleges that NBW unreasonably withheld its consent to the Forman Brothers sale. The allegation that a vice president represented that approval would be given cannot be sued upon as a promise breached in bad faith by virtue of §§ 1823(e) and 1821(d)(9)(A). However, Beitzell is not barred from suing on oral statements that did not constitute promises but instead are acts of bad faith in violation of the contractual obligation of good faith. Thus, Beitzell may sue on its allegations that NBW unreasonably withheld consent to the Forman Brothers transaction.

 Similarly, § 1823(e) and *D'Oench* do not bar Beitzell from suing on its allegation that NBW breached its duty of good faith by unilaterally deciding to terminate Beitzell's business (*e.g.*, without any need to do so to protect NBW); making threats to increase its bargaining position; interfering with Beitzell's contract with Forman Brothers and with Beitzell's prospective business advantages; and demanding that Beitzell pay for an auctioneer to sell inventory.[21] Although in *Bell & Murphy*, 894 F.2d at 754, the court stated that it was irrelevant to the applicability of *D'Oench* whether the claimant was coerced or under economic duress in giving consent to a sale, this statement was made in the context of rejecting claims based on *oral promises* made in the negotiations that led to the agreement to sale. Therefore, Beitzell's contention that NBW's acts were coercive can be considered as a basis for its claim for breach of good faith.

---

**21.** This does not mean, however, that these allegations necessarily suffice to state a claim for relief based on breach of good faith. *See* part IV, *infra*.

Moreover, Beitzell has alleged at least four actions, evidenced in writing, that it contends evidence a breach of this duty: wrongful dishonor of checks, wrongful declaration of default/acceleration, failure to give reasonable notice prior to demanding repayment and unreasonably requiring payment in full within three days of giving demand.

■ The remaining counts sound in tort and, therefore, prior to addressing the remaining claims, the court must first determine whether *D'Oench* and section 1823(e) apply to tort claims. In *Astrup v. Midwest Federal Sav. Bank*, 886 F.2d 1057, 1059 (8th Cir.1989), the court held that the *D'Oench Duhme* doctrine "affords no protection against tort claims against a financial institution...."[22]. *See also Vernon v. RTC*, 907 F.2d 1101, 1108 (11th Cir.1990) (holding that tort claims are not barred by *D'Oench*). However, other courts have held that the doctrine applies to any claim, whether sounding in contract or tort. *See 604 Columbus Ave.*, 968 F.2d at 1344 (*D'Oench* applies to claims involving secret agreements that sound either in tort or in contract) (citing *Timberland Design*, 932 F.2d 46, 50 (1st Cir.1991)); *Castleglen Inc. v. RTC*, 984 F.2d 1571, 1577 (10th Cir.1993) (party cannot simply recast contract defense as affirmative tort claim to evade prohibitions of *D'Oench* doctrine); *Torke v. FDIC*, 761 F.Supp. at 757; *Queen v. First Service Bank*, 129 B.R. 5 (Bankr.N.D.N.H.1991) (doctrine bars tort claims arising out of secret agreements). The courts holding that tort claims are subject to *D'Oench* and the statute note that regardless of whether the claim is a contract or tort action, the inquiry is the same— whether the claim is based on undocumented agreements or other oral representations.

Given the purposes of *D'Oench* and the statute, there is no reason why they should not apply when the claim, although sounding in tort, is based on unrecorded, oral representations or agreements. Moreover, "where the success of an asserted tort claim hinges on an agreement which does not satisfy the requirements of section 1823(e), it is not necessary to determine whether or not the claim falls within the confines of section 1823(e) or *D'Oench Duhme;* for the claim must fail under the plain meaning of section 1821(d)(9)(A)." *Tuxedo Beach*, 749 F.Supp. at 645 (claim for breach of fiduciary duty was based on unrecorded agreement to fund loan).[23] Therefore, if a tort claim relates solely to actions taken with respect to a secret, unrecorded agreement, then such a claim is barred. However, if the claim is based on conduct of the lender independent of any agreement or secret arrangement, that claim is not barred by either *D'Oench* or § 1823(e). With this distinction in mind, the court will consider whether Beitzell's remaining counts should be dismissed.

*Count II*

■ Count II is a claim for breach of fiduciary duty. Several courts have held that a claim for breach of fiduciary duty is barred by either D'Oench or § 1823(e). *See, e.g., Beighley*, 868 F.2d 776; *Clay*, 934 F.2d 69; *Wellington*, 761 F.Supp. at 738; *New Maine Nat'l Bank*, 774 F.Supp. 36. However, these courts barred those claims because the claimant's assertion that a fiduciary duty was owed was based on oral representations or agreements not recorded in the banks records. *American Federation*, 826 F.Supp. at 1472. However, when the basis for finding a fiduciary relationship "derives from a source other than an unwritten agreement, *D'Oench* does not apply." *Id.* (source of duty is in relationship as broker-agent, not in any statements made); *Astrup*, 886 F.2d at 1059 (parties conceded that they were co-venturers and that such co-venturers owe each other a fiduciary duty).

**22.** As examples of the types of claims that would not be barred the court noted a claim for personal injuries to a motorist in a collision with an armored car, for insider profits in a sale in violation of federal securities regulations, or for fraudulently entering into transactions involving discriminatory interest rates. In *Astrup*, the claim for breach of fiduciary duty was based on the allegations that the coventurer fraudulently entered transactions involving discriminatory interest rates.

**23.** As discussed earlier, section 1821(d)(9)(A) bars any claim that is based on, or substantially comprised of, an agreement that does not meet the requirements of section 1823(e).

 In this case, Beitzell's argument that NBW owed a fiduciary duty is, in essence, an attempt to imply a duty or standard that would govern NBW's exercise of the provisions found in the loan agreement. *See New Maine Nat'l Bank*, 774 F.Supp. at 40 (defense of breach of duty of fiduciary duty is nothing more than assertion that the lender's performance of its fiduciary duty was a condition to the repayment of the note); *Clay*, 934 F.2d at 72 (duty to manage loan prudently is a condition that falls within definition of "agreement"). However, this duty/standard is not stated anywhere in the loan agreement. And as the court in *Langley* made clear, section 1823(e) clearly bars any attempt to imply a standard governing the enforcement of the note that is not found in the loan agreement itself. *See Wellington*, 761 F.Supp. at 738 (without relying on oral representations, which are barred by both D'Oench and 1823(e), parties would be unable to establish that a fiduciary duty was owed— other than the oral representations, there were simply no provisions in the loan documents indicating that such a fiduciary relationship existed); *Clay*, 934 F.2d at 73 (claim for breach of fiduciary duty barred when the notes and loan agreements alone did not establish that a fiduciary relationship existed and establishing that such a duty was owed would require evidence outside the bank's files).[24]

 In its Amended Complaint, Beitzell relies upon its longstanding banking relationship with Beitzell, (Amended Complaint ¶ 5) and the control that NBW exercised over all of Beitzell's income (Amended Complaint ¶ 7, 35) as grounds that a fiduciary relationship existed.[25] Although the source of the alleged fiduciary duty appears to be based on the nature of the relationship between Beitzell and NBW, the relationship is being in-

voked primarily to supply a standard of care in the performance of NBW's contractual obligations. Unlike the obligation of good faith, a fiduciary duty is not imposed by the law to every contract on its face. Rather, Beitzell seeks to supply a term (or a standard of performance) that is not implied by law from the face of the contract. *D'Oench* and § 1823(e) bar such an unwritten contract term from being enforced. Beitzell may not disguise its contract claim as a fiduciary duty claim and thereby subject the FDIC to a higher duty of care.

 This does not end the inquiry, however. Although Beitzell's breach of fiduciary duty claim depends on a breach of contract being established, the fiduciary duty existed independent of any contract. Accordingly, Beitzell may prove that the contract was breached and then prove that this constitutes a breach of fiduciary duty as well. To the extent that Beitzell invokes the relationship for this secondary purpose and thereby for the purpose of providing a different basis for damages, the result is nevertheless the same although the analysis is different.

Except for punitive damages, the measure of damages would be the same as for breach of contract on the basis that Beitzell has not alleged different injuries arising from the different counts. *See Greenwood Ranches Inc. v. Skie Construction Co.*, 629 F.2d 518, 521 (8th Cir.1980) (plaintiff is not entitled to separate compensatory damage award under each legal theory when the causes of action are simply alternate theories for seeking the same relief); *Thompson v. Portland*, 620 F.Supp. 482, 489 (D.Me.1985) (amount of compensatory damages depends upon the extent of injury and not the number of theories); 22 Am.Jur.2d, *Damages* § 35 (1988).

---

**24.** Nobody has suggested that the loan documents either expressly or inferentially evidence a fiduciary relationship. Furthermore, the fact that a fiduciary relationship may be inferred from the loan documents is insufficient to support a claim that such a duty is owed. In *Clay*, the court held that while it could be inferred from the documents that the parties agreed that such a duty was owed, inferences of such an agreement are insufficient to support a claim against the FDIC. *See Beighley*, 868 F.2d at 782–83 (inferences that certain duties were owed does

not satisfy the requirements of § 1823(e)); *Bowen*, 915 F.2d at 1016 (FDIC not required to search a failed bank's documents for inferences and hidden duties).

**25.** Beitzell alleges that NBW "owed Beitzell fiduciary duties of good faith, fair dealing and complete honesty ... by virtue of the parties' banking/lending relationship." (Amended Complaint ¶ 34.)

If Beitzell recovers damages on its breach of contract claim, it would not be entitled to recover additional compensatory damages in tort unless it alleges and proves the existence of additional damages attributable solely to the tort. *Rosen v. Marlin*, 486 So.2d 623, 626 (Fla.Dist.Ct.App.1986) (where compensatory damages requested in tort count are identical to those in contract count, damages for tort are not recoverable); *Davison Fuel & Dock Co. v. Pickands Mather & Co.*, 54 Ohio App.2d 177, 376 N.E.2d 965, 968, 8 O.O.3d 324 (1977) (independent actions in contract and tort do not permit recovery of more than the amount of damage actually suffered from the breach of contract). Beitzell has not alleged any damages arising solely from the alleged breach of fiduciary duty. And as seen below, punitive damages may not be recovered against the FDIC. Accordingly, the claim for damages would be redundant and will be dismissed on that basis.

*Counts III and IV*

 Count III is a claim for tortious interference with an existing contract [26] and Count IV is a claim for tortious interference with prospective business. To the extent that these counts are nothing more than Beitzell's allegation that NBW breached its oral promise that it would consent, disguised as a different cause of action, they must be dismissed. *See FDIC v. MM & S Partners*, 626 F.Supp. 681, 687 (N.D.Ill.1985) (party cannot dress up breach of oral agreement in garb of waiver and estoppel). However, as in the case of Count I, these claims are not premised solely upon oral representations and agreements and thus are not barred by *D'Oench* and § 1823(e).

*Count V*

 Count V is a claim based on negligent misrepresentation. The sole basis for this claim is the alleged oral representation by an NBW vice president that NBW would give its consent to the Forman Brothers transaction. (Amended Complaint ¶ 44–48.)

Reliance on this type of oral, unwritten representation is exactly the type of agreement that the *D'Oench* doctrine operates to bar. *Desmond v. FDIC*, 798 F.Supp. 829, 834–5 (D.Mass.1992) (claim based on unrecorded promise to settle was barred). Under *D'Oench*, a claim cannot be asserted against the FDIC based on secret or unrecorded agreements. Accordingly, Count V must be dismissed.

IV. *Even if Beitzell's Claims are Not Barred By D'Oench or Section 1823(e), Has Beitzell Alleged Facts Sufficient to Withstand A Motion to Dismiss?*

 In addition to asserting that Beitzell's claims were barred by *D'Oench*, section 1823(e) and the federal holder in due course doctrine, the FDIC contends that Beitzell's claims do not allege facts sufficient to state a claim upon which relief can be granted. Given the court's earlier decision above, Counts I, III and IV are the only claims which must be addressed.

 Beitzell's complaint must only allege plausible grounds in order for it to survive a motion to dismiss. *See McLean Financial Corp.*, 659 F.Supp. at 1569. The following allegations and related facts as incorporated in Count I of the complaint provide plausible grounds upon which Beitzell could prove that NBW breached its duty of good faith and fair dealing owed to Beitzell: wrongful dishonor of checks, wrongful declaration of default/acceleration, failure to give reasonable notice prior to demanding repayment and unreasonably requiring payment in full within three days of giving demand, unreasonably withholding its consent, unilaterally deciding to terminate Beitzell's business (to the extent this allegation suggests that NBW's actions forced Beitzell out of business and into bankruptcy), making threats, and demanding that Beitzell pay for an auctioneer at an exorbitant price to sell its inventory. However, two of Beitzell's allegations in support of Count I, that NBW interfered with Beitzell's contract with Forman Brothers and with its

---

**26.** Tortious interference with contractual relations arises when a defendant interferes with a contract between the plaintiff and some third party. *Weaver v. Gross*, 605 F.Supp. 210, 216 (D.D.C.1985); *Donohoe v. Watt*, 546 F.Supp. 753, 757 (D.D.C.1982), *aff'd*, 713 F.2d 864 (D.C.Cir. 1983); *1301 Conn. Ave.*, 126 B.R. at 832.

prospective business relationships are nothing more than conclusory allegations that are unsupported by the facts alleged. Therefore, these two allegations cannot be relied upon by Beitzell as support for Count I and will be dismissed. However, because the court is required to read the complaint liberally on a motion to dismiss, the court finds that Beitzell's remaining allegations in Count I are sufficient to withstand the FDIC's motion to dismiss. *See K.M.C. Co. Inc. v. Irving Trust Co.*, 757 F.2d 752, 760 (6th Cir.1985) (obligation of good faith required lender to give notice to borrower before it curtailed financing and demanded repayment); *Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9 (1st Cir.1987) (bank breached obligation of good faith by failing to give notice of intent to terminate relationship and failing to make an effort to negotiate alternative solutions).

 Counts III and IV are causes of action for the tort of intentional interference with an existing contract and with a prospective business relationship, respectively. In support of these Counts, Beitzell has only alleged actions taken by NBW that were directed towards Beitzell itself, rather than towards some third party that has either entered into a contract with Beitzell or was considering doing business with Beitzell. Actions by a lender that are directed only at its borrower do not state a cause of action for intentional interference with contract or prospective business, even when those actions directed at the borrower indirectly affect the borrower's relation with some third party. *See, e.g., IK Corp. v. One Financial Place Partnership*, 200 Ill.App.3d 802, 146 Ill.Dec. 198, 209, 558 N.E.2d 161, 172 (1990) (acts forming basis of tortious interference claim must be directed at parties other than plaintiff); *State National Bank v. Academia Inc.*, 802 S.W.2d 282, 295–97 (Tex.Ct.App.1991) (applying Illinois law) (same). Moreover, Beitzell has not alleged any facts from which it could be inferred that NBW intentionally interfered with Beitzell's contract with Forman Brothers or its business relationships. *See Trimed Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 890 (4th Cir.1992) (plaintiff must prove party intentionally and wrongfully hindered contract performance); *Laser Industries Ltd. v. Eder Inst. Co.*, 573 F.Supp.

987 (N.D.Ill.1983) (no evidence that purpose in withholding consent was to induce third party not to enter into contract).

 Even if NBW is found to have breached its contract with Beitzell by withholding its consent in bad faith, that breach serves no basis for a claim for intentional interference with contract. *1301 Conn. Ave.*, 126 B.R. at 833 (citing *Business Equipment Center Ltd. v. DeJur–Amsco Corp.*, 465 F.Supp. 775, 788 (D.D.C.1978) ("Interference with a contract between a plaintiff and a third party, which is caused by the defendant's breach of his own contract with plaintiff, serves as no basis for claim of intentional interference with contract.")) Assuming that NBW's alleged breach of contract in turn resulted in the breach of the sale agreement with Forman Brothers, Beitzell's remedy is not a claim for tortious interference with contract, rather, it is an element of damages for Beitzell's breach of contract claim. *id.*

Accordingly, Counts III and IV will be dismissed as failing to state a claim upon which relief can be granted.

## V. *Beitzell's Objection to NBW's Claim*

Beitzell's amended complaint included an objection to NBW's proof of claim in the amount of $2,545,000 that was filed in Beitzell's bankruptcy case on August 9, 1990. Beitzell has asserted two grounds for its objection. First, Beitzell contends that its records indicate that NBW's claim is approximately $765,845.00. (Amended Complaint ¶ 53). In its Motion to Dismiss, the FDIC did not specifically address this allegation or move for dismissal of the objection on this ground. Accordingly, Beitzell's objection on this ground will not be dismissed.

The second ground for its objection is simply the reassertion of the claims against NBW set forth in the earlier portions of the complaint. (Amended Complaint, ¶ 54.) The court has determined that all of those claims, except for Count I, will be dismissed. As a result, those dismissed claims cannot provide grounds for Beitzell's objection to NBW's claim. Therefore, only Count I can provide a basis for Beitzell's objection.

 

Beitzell has alleged that under the doctrine of recoupment, its claims (which is now only Count I) against NBW constitute a defense to the payment of NBW's claim. (Amended Complaint ¶ 55.) The FDIC did not argue as a grounds for dismissal that recoupment cannot be had against the FDIC. Nor have the parties briefed the issue. Therefore, the court reserves ruling on the issue of whether Beitzell can assert recoupment. *See 1301 Connecticut Ave.*, 126 B.R. at 831 n. 5.

### VI. *Punitive Damages*

■ Beitzell seeks an award of $25,000,000 in punitive damages. Punitive damages may not be assessed against public instrumentalities. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). *See Professional Asset Management, Inc. v. Penn Square Bank*, 566 F.Supp. 134 (W.D.Okla.1983) (punitive damages are inappropriate against government when acting in the public interest). In *Tuxedo Beach*, the court held that a claim for punitive damages may not be asserted against the FDIC as receiver "on the grounds that it would contravene public policy and constitute an assessment of punitive damages against a United States instrumentality." 749 F.Supp. at 650. The court reasoned that the FDIC, when acting as receiver for a failed institution, is responsible for managing and resolving the affairs of that institution for the benefit of creditors, unsecured depositors and the federal taxpayer. In addition, punitive damages are designed to punish a wrongdoer, and where the wrongful party is in receivership, the only parties punished would be the innocent creditors. This court agrees with *Tuxedo Beach*. *See 1301 Connecticut Ave.*, 126 B.R. at 831 n. 5. Accordingly, Beitzell is barred from asserting a claim for punitive damages against the FDIC as Receiver.[27]

### CONCLUSION

Count I will not be dismissed. The remaining Counts, II, III, IV, and V, will be dismissed in toto. With respect to the objection to NBW's claim, the motion to dismiss will be granted in part, and denied in part, with the court reserving ruling on the issue of whether recoupment may be asserted against the FDIC.

---

27. Since the FDIC is only acting in its receivership capacity, I need not address whether punitive damages can be recovered against the FDIC when acting in its corporate capacity.